**John S. PLEASANT, et al.,**
**Plaintiffs–Appellants,**

v.

**Larry LOVELL, Larry Hyatt, Vernon Pixley, Kenneth Batson and Tim Fortune, Defendants–Appellees.**

**No. 87–1384.**

United States Court of Appeals,
Tenth Circuit.

May 16, 1989.
As Amended June 6, 1989.

William A. Cohan (Carl E. Stahl, with him on the brief), Cohan & Stahl, P.C., Denver, Colo. (John S. Pleasant, pro se, with him on the brief), for plaintiffs-appellants.

Elaine F. Ferris, Atty., Tax Div., Dept. of Justice, Washington D.C. (Roger M. Olsen, Asst. Atty. Gen., Michael L. Paup, and Jonathan S. Cohen, Attys., Tax Div., Dept. of Justice, Washington, D.C., with her on the brief and Robert N. Miller, U.S. Atty., Denver, Colo., of counsel), for defendants-appellees.

Before McKAY, McWILLIAMS and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

## I.

Plaintiffs-appellants, 145 members of an organization known as the National Commodity and Barter Association (NCBA), sought in this case to recover damages from defendants-appellees, five agents of the Criminal Investigation Division of the Internal Revenue Service (IRS), for alleged infringement of the members' constitutional rights. The NCBA is an organization advocating organized opposition to the federal income tax laws. Defendants-appellees held various positions in the Criminal Investigation Division of the IRS: Lovell, Batson and Fortune were special agents, Pixley was a group manager, and Hyatt was the chief of the Denver division.

This case arose from a criminal tax investigation of various members of the NCBA during the latter half of 1979. A federal grand jury investigation followed in 1980 in Denver. During the summer of 1979, the IRS was concentrating its investigation on the NCBA and its founder, John Grandbouche. The IRS maintains that it was concerned with the promotion of tax evasion by the NCBA and its members, harass-

ment of IRS agents working on tax collection matters, and a possible link between the NCBA and other tax protester organizations.

The cornerstone of NCBA doctrine is the belief that the federal income tax is unconstitutional. Other goals of the NCBA philosophy include abolition of the Federal Reserve System and a return to the gold standard. NCBA members are urged to participate in seminars which discuss ways in which taxpayers may make largely meritless challenges to the authority and procedures of the IRS. NCBA members provide assistance, if it can be called that, to persons involved in tax disputes with the IRS. They encourage self-representation and are willing to provide legal training.

Some record evidence suggests that NCBA members may have advocated or participated in various schemes designed to evade federal income tax. These included engaging in a barter system for the purpose of not recognizing taxable income, submitting incorrect employee withholding forms (Form W–4) claiming exemption from federal tax withholding, and transacting business through a warehouse bank, such as the National Commodity Exchange (NCE), so as to avoid IRS scrutiny concerning cash deposits and payments, *see Heinhold Hog Market, Inc. v. McCoy*, 700 F.2d 611, 616 (10th Cir.1983). While the political speech of NCBA members is protected by the first amendment, the same is not true of speech encouraging or facilitating illegal activity.

Thus, the NCBA and some of its members engaged in a variety of activities of interest to the IRS. This interest soon resulted in an investigation by the defendants. The investigation was advanced by inside information when, in September 1979, one Pauline Adams called the Criminal Investigation Division of the IRS and spoke to defendant Lovell. She indicated that she had information relevant to the investigation. With defendant Pixley's approval, defendant Lovell later met with Adams.

Previously, Adams had met John Pleasant, plaintiff-appellant and NCBA member, when she was employed by a bankruptcy trustee in Denver. She assisted Pleasant with some pleadings before the district court. During the course of this assistance, Pleasant discussed the NCBA and its objectives with Adams. Adams expressed interest in the organization and later met Grandbouche. Thereafter, Adams agreed to come to Grandbouche's home and assist the NCBA in the preparation of subsequent pleadings. According to Adams, while she was assisting, she overheard discussions concerning NCBA activities and intimidation of IRS personnel. For reasons not entirely clear from the record, she then phoned the IRS and offered to disclose what she had overheard.

Subsequently, Adams maintained her association with the NCBA and provided information to defendant Lovell. Adams requested that her identity remain confidential; defendant Lovell, with the approval of defendants Pixley and Hyatt, prepared a request that she be classified as a restricted source confidential informant. With this classification, knowledge of Adams' identity would be limited within the IRS. The classification was approved by the district director of the IRS in mid-October 1979. A few weeks later, the IRS learned that Adams had a state court felony conviction for assault with a deadly weapon and that she was on probation. The IRS also learned from the Colorado Bureau of Investigation that Adams was hard to control as an informant, always wanting greater involvement. Rec. vol. VI, ex. 18 at 38–39 (Hovde depo. Mar. 6, 1984). That assessment would prove accurate.

After losing her job with the bankruptcy trustee, Adams further ingratiated herself with NCBA members and was offered a clerical position with the organization. She approached defendant Lovell about this prospect of full-time employment with the NCBA. Defendant Lovell told Adams that, if she obtained such a position, she could provide the IRS with valuable information about the tax protest movement. He also told her that any decision to work for the NCBA would be her independent decision, and that she should give due regard to her

personal safety and financial condition. He also stressed that if she accepted employment with the NCBA and continued to provide information to the IRS, she should be cautious not to entrap the NCBA members or commit unlawful acts.

Adams went to work for the NCBA and began providing information and NCBA documents to the IRS. On October 23, 1979, she met with defendants Lovell, Hyatt and Pixley. Two things happened of note. First, defendants photocopied and then returned NCBA documents that were provided by Adams. These documents included NCBA instructional materials and the correspondence of Mr. Grandbouche. Second, Adams reported that she had heard a discussion at the NCBA office threatening harm to a federal judge and IRS personnel. This was consistent with more general information heard by another IRS special agent a few days earlier at a seminar where NCBA founder Grandbouche and NCBA member Jerry Manka discussed their views on federal tax avoidance.

Defendants Hyatt and Lovell then obtained authorization from the National Office of the IRS and the Department of Justice to electronically monitor the conversations of Grandbouche, Manka and other NBCA members. Adams had agreed to carry a concealed microphone and transmitter into the NCBA office and did so for three days in October 1979. A recording unit was also placed in her car for one day. Defendant Fortune assisted with the technical aspects of the consensual monitoring and recording activities. Defendant Pixley coordinated the endeavor, and defendant Lovell assisted. The electronic surveillance was discontinued at the end of October for lack of evidence.

In early November 1979, Adams told defendant Lovell that she had been instructed to take the NCBA's trash home and burn it. She offered to let defendants Lovell and Pixley search the trash before she destroyed it. The agents accepted her offer.

Adams had agreed to stay in daily contact with the agents. Rec. vol. V., pl. ex. 1–AA (Lovell file memo. 10/31/79). Over a seven-week period, defendants Lovell and Pixley, alone or in combination, met with Adams ten times. Rec. vol. I, doc. 3, ex. A, ¶ 62 at 19–23 (Lovell affidavit); ex. B, ¶ 26 at 10–15 (Pixley affidavit). At these meetings, Adams provided a narrative of what the trash contained and responded to questions. Over a nine-week period, defendant Lovell had some nineteen telephone conversations with Adams concerning the activities of Grandbouche and the NCBA. Rec. vol. I, doc. 3, ex. A, ¶ 64 at 23–24 (Lovell affidavit).

Defendants Lovell and Pixley have submitted affidavits to the effect that Adams operated independently and was instructed repeatedly not to take any items other than trash discarded by Grandbouche. Certain file memoranda drafted by defendant Lovell support that contention. Rec. vol. V, pl. exs. 1–AA, 1–BB, 1–GG, 1–HH, 1–LL. Adams has testified on deposition that she considered herself a "nonpaid informant" and that she removed only trash. Rec. vol. I, doc. 3, ex. J at 47–49 (Adams deposition Aug. 20, 1981). However, the record reveals that on three occasions, Adams supplied the special agents with items from the NCBA office which were not trash. These items included: 1) a copy of a handwritten mailing list of NCBA members or supporters (over 100 pages) containing over 700 names, given to Adams for the typing of individual names onto cards, 2) a duplicate of a cassette tape letter mailed by Grandbouche to another party, and 3) 183 original affidavits subscribed by supporters of an NCBA spinoff organization known as the Committee of 200,000 to Save the State of Colorado. This organization is affiliated with the tax protest movement. Defendants Lovell and Pixley copied the affidavits and returned the originals to Adams. According to defendants Lovell and Pixley, the above items were stored and not used by them for any investigatory purpose. Even had these items been disseminated, the defendants contend that only 30 of the plaintiffs in this action could have been identified. Appellees' Brief at 17.

Initially, defendant Lovell dictated file memoranda of the meetings with Adams, but later tape recorded those meetings be-

cause Adams had "a gift for gab." Rec. vol. VI, pl. ex. 15 at 110–11 (Lovell depo. 1/9/86). Some of the meetings between Adams and defendants Lovell and Pixley were taped by the defendants. The tapes, and the inferences that can be drawn therefrom, are central to the plaintiffs' claim that Adams was acting at the direction of the government and violating the first and fourth amendment rights of plaintiffs by "creating trash" at the NCBA offices and delivering it to the government, all without the formality of a warrant and a showing that the government had a compelling interest in this material. While the parties do not dispute the majority of transcribed statements, they do not agree on the proper characterization of those statements. We set out and discuss those statements in the context of whether qualified immunity for the defendants in this case is appropriate.

The trash as collected and interpreted by Adams contained information concerning financial transactions of the NCBA and others. The IRS learned the identity of certain banks utilized by the NCBA and Grandbouche. This information was provided to a grand jury investigating certain tax protesters. Defendants Lovell and Batson assisted with the grand jury investigation and served grand jury subpoenas upon the summoned parties, including financial institutions and members of the NCBA. In July 1980, a grand jury subpoenaed financial records related to the NCBA and Grandbouche at the First National Bank of Englewood. Defendant Batson served the subpoenas on the bank and, when asked, told the bank that it was not necessary to notify the customers involved of the subpoenas. Batson indicated that he was without authority to prevent the bank from notifying its customers, but that the grand jury's investigation would be easier if the customers were not notified. The bank complied with the subpoena without giving notice to its customers.

Adams left the employ of the NCBA at the end of December 1979. She notified defendant Lovell and then disclosed her status as an IRS informant, telling various elected federal officials and the news media. She claimed that she had provided information concerning dangerous tax protester activities, yet the IRS refused to provide her adequate protection. Based on this turn of events, the IRS Criminal Investigation Division decided to terminate its relationship with Adams. Still, the IRS sought to have Adams confirm her version of her undercover work for the agency. In early January 1980, defendants Lovell and Pixley met with Adams so that she might respond to a series of questions summarizing her activities. The grand jury proceedings related to this investigation terminated during the summer of 1982. None of the plaintiffs were indicted, nor was NCBA founder Grandbouche or NCBA member Manka.

## II.

In November 1983, plaintiffs filed this action, claiming that the activities of the defendants violated their constitutional rights. Specifically, plaintiffs claim that the investigatory activities of defendants violated the first and fourth amendment rights of the NCBA members. Plaintiffs allege that Adams was acting as an agent of the IRS Criminal Investigation Division and thus that her actions should be imputed to the federal defendants. Plaintiffs maintain that Adams' inspection of financial information, correspondence and other documents was an illegal search, contrary to the fourth amendment. Further, they maintain that Adams' search and seizure of the NCBA membership list and the affidavits of Committee of 200,000 violated not only the fourth amendment, but also the first amendment. They also complain that the surveillance conducted by the defendants violated first amendment rights of NCBA members, even if the surveillance complied with the fourth amendment. According to plaintiffs, the purpose and effect of the defendants' activities was to harass NCBA members, causing some to abandon the organization and other potential members not to join.

Plaintiffs also rely on the first and fourth amendments in challenging defendants' actions which led to the empaneling

of a federal grand jury. They object to the grand jury subpoenas issued to the First National Bank of Englewood because the bank was requested not to provide notice. Overall, plaintiffs complain of a conspiracy among the defendants to chill the exercise of speech and associational freedoms and deny them protection against unreasonable searches and seizures. U.S. Const. amends. I & IV.

Defendants maintain that all of their activities were shielded by either absolute or qualified immunity. They contend that Adams was not a government agent; rather, she operated privately and gratuitously. As for the items Adams took from the trash, defendants maintain that the plaintiffs had no reasonable expectation of privacy in those items. As for the other items taken, defendants maintain that Adams' access to those items belies any reasonable expectation of privacy. Moreover, defendants contend that a grand jury may subpoena bank records without liability attaching to those assisting the grand jury. Finally, defendants contend that plaintiffs have not been harmed because the information and documents provided by Adams were not used for any improper purpose; most of the information simply was stored away.

The district court granted the defendants' motion for summary judgment, finding that Adams was not an agent of the government. 654 F.Supp. 1082. In the alternative, the district court determined that the defendants Lovell, Pixley and Hyatt were entitled to qualified immunity because no clearly established law provided that trash, even if it was to be withheld from the public and burned, could support a reasonable expectation of privacy. The district court also determined that defendant Batson properly could inform the bank that it need not alert its customers to a grand jury subpoena and that defendant Fortune's technical assistance with consensual monitoring was not actionable.

On appeal and at oral argument, plaintiffs contend that the district court should have granted summary judgment in their favor on the issue of defendants' liability.

They argue that the trial court should have determined that 1) Adams was an agent of the government defendants, 2) that defendants Lovell, Pixley and Hyatt were not entitled to qualified immunity, and 3) that defendants Fortune and Batson were liable for their grand jury activities including the service of subpoenas. Though we have jurisdiction to review a denial of qualified immunity in the absence of a final judgment, *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985), in this case our jurisdiction arises from the district court's final judgment granting summary judgment in favor of defendants. *See* 28 U.S.C. § 1291.

We reverse the trial court's grant of summary judgment with respect to defendants Lovell, Pixley and Hyatt because there is a genuine issue of material fact concerning the lawfulness of some of their activities and qualified immunity for all claims of the plaintiffs is not warranted. On the other hand, we affirm the grant of summary judgment on behalf of defendants Batson and Fortune on immunity grounds, because plaintiffs have failed to come forward with sufficient evidence suggesting clearly established unconstitutional conduct. The district court's decisions on qualified immunity and summary judgment present questions of law which we review *de novo*. *Mitchell v. Forsyth*, 472 U.S. at 528 n. 9, 105 S.Ct. at 2816 n. 9; *Todd v. United States*, 849 F.2d 365, 368 (9th Cir. 1988).

### III.

A suit for damages against a federal agent in his official capacity would be barred by sovereign immunity, unless the government has waived sovereign immunity. *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir.1989) (sovereign immunity bars suit against IRS agents sued in their official capacities). But, a suit for damages against a federal agent in his individual capacity acting under color of federal authority would not be barred by sovereign immunity, insofar as certain constitutional claims are alleged. *Davis v. Passman*, 442 U.S. 228, 245–48, 99 S.Ct. 2264, 2277–78,

60 L.Ed.2d 846 (1979); *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 395–97, 91 S.Ct. 1999, 2004–05, 29 L.Ed.2d 619 (1971). In *Bivens*, the Court held that liability may attach when a federal official acting under color of authority engages in unconstitutional conduct and is then held to account for that conduct in his individual capacity. *Id.* at 389, 91 S.Ct. at 2001; *see also Schweiker v. Chilicky*, — U.S. —, 108 S.Ct. 2460, 2466–68, 101 L.Ed.2d 370 (1988) (evolution of *Bivens* remedy discussed). However, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In evaluating this defense of qualified immunity, we must compare the "objective reasonableness" of the conduct complained of with the state of the law at the time of the alleged violation. *Id.* For a plaintiff to prevail, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Once a defendant raises the defense of qualified immunity, the plaintiff must "come forward with facts or allegations to show both that the defendant's alleged conduct violated the law and that law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 646 (10th Cir.1988). The defendant prevails unless such a showing is made; however, even if the plaintiff makes such a showing, the defendant still may prevail if he can establish "extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard." *Harlow v. Fitzgerald*, 457 U.S. at 819, 102 S.Ct. at 2738.

The qualified immunity standard serves to minimize interference with government officials performing discretionary government functions and "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Because the grant of qualified immunity may be dispositive, it should be considered first. The appellate issue here is straightforward: Do the facts alleged by the plaintiffs support a violation of clearly established law of which a reasonable person would have known? *Mitchell v. Forsyth*, 472 U.S. at 528 n. 9, 105 S.Ct. at 2816 n. 9; *Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). It is "an objective inquiry, albeit a fact-specific one." *Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 117 (6th Cir.1988).

In this case, extensive discovery has occurred. The summary judgment evidence submitted by the parties creates an issue of material fact concerning the events in which Adams and defendants Lovell, Pixley and Hyatt were involved. *See Anderson v. Creighton*, 107 S.Ct. at 3042 n. 6. The constitutional implications of the facts differ, depending upon which version is correct. On the other hand, the summary judgment evidence establishes that defendants Batson and Fortune are entitled to qualified immunity given a dearth of evidence concerning conduct which might be inconsistent with constitutional guarantees.

## IV.

As noted, plaintiffs contend that the conduct of the defendants violated their first and fourth amendment rights. The two constitutional theories in this case are related. Searches and seizures of items presumptively protected by the first amendment must strictly comply with the fourth amendment. *Maryland v. Macon*, 472 U.S. 463, 468, 105 S.Ct. 2778, 2781, 86 L.Ed.2d 370 (1984); *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965). And when first amendment freedoms are involved, the first amendment may justify greater protection than mere compliance with the fourth amendment. *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 546, 83 S.Ct. 889, 893, 9 L.Ed.2d 929 (1963).

There is evidence in the record that the first amendment would protect some of the activities of the NCBA and its members, particularly advocacy concerning the lawful modification or elimination of the federal tax system. There are a number of ways in which government action may infringe upon a group member's right to associate with others to promote an unpopular viewpoint. *Roberts v. United States Jaycees*, 468 U.S. 609, 622–23, 104 S.Ct. 3244, 3251–52, 82 L.Ed.2d 462 (1984). These include imposing penalties or withholding benefits because of group membership, requiring disclosure of group membership when anonymity is desired, or interfering with the internal workings of the group. *Id.* Indeed, regarding the grand jury subpoena which was issued here and ultimately challenged, we directed that first amendment associational freedoms of the NCBA and its members be respected when the government investigates allegations of unlawful tax avoidance and seeks bank records which would identify an organization's membership. *First Nat'l Bank v. United States*, 701 F.2d 115, 117–18 (10th Cir.1983); *see also United States v. Citizens State Bank*, 612 F.2d 1091, 1093–94 (8th Cir.1980) (first amendment associational freedoms apply to organization challenging tax laws). And in *Voss v. Bergsgaard*, 774 F.2d 402, 405 (10th Cir.1985), we required that NCBA items seized pursuant to overbroad search warrants be returned, noting not only that the warrants at issue lacked sufficient particularity to satisfy the fourth amendment, but also that they were particularly infirm given that speech and associational rights of NCBA members were necessarily implicated. *Id.* at 405; *see also United States v. Stelten*, 867 F.2d 446, 451–52 (8th Cir.1989) (Heaney, J., dissenting). Finally, in *Grandbouche v. Clancy*, 825 F.2d 1463, 1465–66 (10th Cir.1987), we held that the trial court must consider a claim of first amendment privilege concerning discovery requests for documents identifying the NCBA membership.

█ In considering the plaintiffs' first amendment claim for freedom of expressive association, we are mindful of the multiple purposes of this organization. The NCBA and its members engaged not only in political advocacy concerning the tax system, but also in various business transactions including receiving funds from members. We agree with the Eleventh Circuit, however, that the presence of some commercial activity does not change the standard of first amendment review, although commercial activity might make the challenged state action less disruptive of the political message. *In re Grand Jury Proceeding*, 842 F.2d 1229, 1235 (11th Cir. 1988).

State compelled disclosure of the identity of group members has important first amendment implications. The reason for this is that the first amendment protects

> the rights of the people to associate together to advocate and promote legitimate, albeit controversial, political, social or economic action; that when the objective of the group or the group itself is unpopular at a given time or place, revelation of the identities of those who have joined themselves together or have affiliated with the group may provoke reprisals from those opposed to the group or its objectives; and that the occurrence or apprehension of such reprisals tends to discourage the exercise of the rights which the Constitution protects.

*Pollard v. Roberts*, 283 F.Supp. 248, 256 (E.D.Ark.), *aff'd mem.*, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968). In these circumstances, compelled disclosure of the identities of group members requires the state to show a substantial relationship between the information sought and a legitimate state interest. *Id.* at 256–57. It was clearly established law in 1979 that an "overriding and compelling" state interest must be demonstrated before disclosure would be justified. *Gibson*, 372 U.S. at 546, 83 S.Ct. at 894; *see also Bates v. City of Little Rock*, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. 449, 466, 78 S.Ct. 1163, 1173, 2 L.Ed.2d 1488 (1958).

It was also clearly established law in 1979 that the fourth amendment proscribed

unreasonable searches and seizures by government agents. Subject to a few carefully defined exceptions not applicable in this case, searches and seizures without a valid warrant are *per se* unreasonable under the fourth amendment. *See Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The Constitution requires that a valid search warrant be approved by a neutral magistrate in advance to guard against the abuse of government power. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564. (1971).

## V.

The first qualified immunity issue in this case is whether defendants Lovell, Pixley and Hyatt could, as a matter of law, reasonably have believed that their interaction and receipt of information from Adams was lawful given the relationship between the government and Adams.[1] Adams inspected and removed documents and other items from the NCBA office without a warrant and without regard to whether any of the material was protected by the first amendment. "In order to impose personal liability, the [plaintiffs] must show that the seizure of specific items was illegal and that it was so illegal that it violated clearly established law." *Williams v. Kunze*, 806 F.2d 594, 600 (5th Cir.1986). Should it have been apparent to the defendants that Adams would be perceived as an agent or instrument of the government, and thus subject to the requirements of the fourth amendment?[2] *See Coolidge v. New*

*Hampshire*, 403 U.S. at 487, 91 S.Ct. at 2048.

The Supreme Court has held consistently that the protections of the fourth amendment only apply to governmental action; an unreasonable search or seizure by a private person not acting as a government agent or with the participation or knowledge of the government is beyond the scope of the fourth amendment. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921); *see also United States v. Smith*, 810 F.2d 996, 997 (10th Cir.1987), *cert. denied*, —— U.S. ——, 109 S.Ct. 218, 102 L.Ed.2d 210 (1988); *United States v. Walsh*, 791 F.2d 811, 813–14 (10th Cir.1986). But if the government coerces, dominates or directs the actions of a private person, a resultant search and seizure may implicate the guarantees of the fourth amendment. *Coolidge v. New Hampshire*, 403 U.S. at 489, 91 S.Ct. at 2049. Whether the fourth amendment applies to a search involving a private person is determined after considering all the facts and circumstances of the case. *Id.*

At the time of the events complained of, this circuit recognized that a search or seizure conducted by a private person was beyond the scope of the fourth amendment, unless the search or seizure was a "joint venture" or a product of collusion between the private person and the federal agents. *United States v. Ford*, 525 F.2d 1308, 1312 (10th Cir.1975); *United States v. Harding*, 475 F.2d 480, 483 (10th Cir.), *vacated on*

---

**1.** By its terms, the first amendment serves to limit state action, not action which is private in character. *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567, 92 S.Ct. 2219, 2228, 33 L.Ed.2d 131 (1972). "[W]hile statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection is provided by the Constitution itself." *Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976). Likewise, the fourth amendment serves to limit state power, not action which is private in character. *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921).

**2.** While we recognize that compliance with the fourth amendment sometimes may be insuffi-

cient to protect first amendment interests, in this case we analyze the question of the agency relationship between Adams and defendants Lovell, Pixley and Hyatt under the fourth amendment. After applying clearly established fourth amendment principles, we reject the contention that these defendants are entitled to qualified immunity. Based on the summary judgment evidence relied upon by the plaintiffs, a reasonable special agent could not believe that all of the activity of Adams was private in character. Having rejected the qualified immunity defense on this issue on fourth amendment grounds, we do not proceed to analyze it under potentially more rigorous first amendment standards.

*other grounds,* 414 U.S. 964, 94 S.Ct. 274, 38 L.Ed.2d 211 (1973). We subsequently have defined a private act as "a unilateral act by an individual with no encouragement or acquiescence by the officers." *United States v. Lamport,* 787 F.2d 474, 476 (10th Cir.), *cert. denied,* 479 U.S. 846, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986). In 1976, the Ninth Circuit observed that there was a "gray area" between the complete absence of governmental involvement in a search and the situation "where governmental involvement is so pervasive that it is no longer even nominally private." *United States v. Sherwin,* 539 F.2d 1, 6 n. 5 (9th Cir.1976).

Several cases in which the actions of a private person have been attributed to the government have involved government conduct more directly intrusive than what plaintiffs have shown here. In *Corngold v. United States,* 367 F.2d 1 (9th Cir.1966), an airline employee "participated in the search solely to serve the purposes of the government." *Id.* at 5. Likewise, in *United States v. Newton,* 510 F.2d 1149 (7th Cir.1975), a Drug Enforcement Administration (DEA) agent told an airline employee that he (the DEA agent) was without authority to search luggage, so the airline employee conducted the search in the presence of DEA agents; this "joint participation" between the government and private airline employees was considered a government search. *Id.* at 1153–54. In *United States v. Payne,* 429 F.2d 169 (9th Cir.1970), a vacationing police officer summoned a park ranger and accompanied him to a campsite. The off-duty police officer questioned the defendant, searched the defendant's vehicle and found contraband, and then participated in arresting the defendant. *Id.* at 170–71. This search could only be construed as governmental in nature given "the observation, guidance, direction and consent" of the federal park ranger. *Id.* at 170.

A case with facts similar to this is *United States v. Walther,* 652 F.2d 788 (9th Cir.1981). In *Walther,* an airline employee opened an overnight case placed in a container for prompt delivery (a Speed Pak), discovered contraband, and reported it to the DEA. The employee was a confidential informant of the DEA and had been rewarded for providing drug-related information. The court of appeals upheld the district court's determination that a governmental search and seizure occurred because: 1) the DEA knew or should have known that the employee was searching Speed Paks for illegal drugs because of its extensive contact with the employee, and 2) the employee's motivation probably was for financial reward. *Id.* at 792–93. The court emphasized the narrowness of its holding: "We merely hold that the government cannot knowingly acquiesce in and encourage directly or indirectly a private citizen to engage in activity which it is prohibited from pursuing where that citizen has no motivation other than the expectation of reward for his or her efforts." *Id.* at 793. If *Walther* is distinguishable at all it is only because there is little evidence to suggest that the confidential informant in this case (Adams) was motivated by the prospect of a monetary reward.

■ In deciding whether a private person has become an instrument or agent of the government, two important inquiries are: "1) whether the government knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *United States v. Miller,* 688 F.2d 652, 657 (9th Cir.1982); *Walther,* 652 F.2d at 792; *accord United States v. Snowadski,* 723 F.2d 1427, 1429 (9th Cir.), *cert. denied,* 469 U.S. 839, 105 S.Ct. 140, 83 L.Ed.2d 80 (1984) (cited with approval in *United States v. Lamport,* 787 F.2d at 476). Several cases have held that there is no conduct foreclosed by the fourth amendment when a private person voluntarily turns over property belonging to another and the government's direct or indirect participation is nonexistent or minor. *See, e.g., United States v. Black,* 767 F.2d 1334, 1339 (9th Cir.), *cert. denied,* 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985); *United States v. Veatch,* 674 F.2d 1217, 1221–22 (9th Cir. 1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); *United States*

v. *Gumerlock*, 590 F.2d 794, 800 (9th Cir.) (en banc), *cert. denied*, 441 U.S. 948, 99 S.Ct. 2173, 60 L.Ed.2d 1052 (1979).

 In this case, defendants Lovell, Pixley and Hyatt knew of and acquiesced in the conduct of Adams. She informed them periodically of her activities and made numerous deliveries of items from the NCBA offices. The summary judgment evidence does not allow us to conclude that reasonable special agents could have believed that their receipt of documents from Adams was lawful because she was a private actor. The involvement of Adams was continuous over a three-month period, and it was not confined to a discrete suspected crime. The variety of the information obtained on this fishing expedition, the degree of supervision by the defendants, and the sheer number of contacts between Adams and defendants Lovell, Pixley and Hyatt belie the notion that Adams merely was acting as a responsible citizen and merely delivering trash to government agents. Moreover, plaintiffs rely on an excerpt of a taped conversation between Adams and defendants Lovell and Pixley which strongly supports the contention that the defendants actually knew that Adams was acting as a government agent. *See Harlow v. Fitzgerald*, 457 U.S. at 821, 102 S.Ct. at 2739 (Brennan, J., concurring) (government official who actually knows that he is violating the law is not entitled to qualified immunity even if actions objectively reasonable). The excerpt is as follows:

ADAMS: You know right now you could get an agent in there[.]

PIXLEY: In where?

ADAMS: In there, in their meeting.

LOVELL: Why, you?

PIXLEY: When they gonna have another. What meeting? (pause) What's the next one?

ADAMS: Like going down to the one in Colorado [S]prings ...

LOVELL: Why do you say that: [sic]

ADAMS: ... that three days (pause) because, ahh, I told them that, ahh, I broke off with my boyfriend (pause)

and I could get in there that way, if no one would recognize anbody [sic]

LOVELL: Yea [sic], but didn't you tell that John was suspicious[?]

ADAMS: Yeah, a little bit.

PIXLEY: Of plants?

LOVELL: Of plants?

ADAMS: Uh-huh.

LOVELL: We don't need an agent in there as long as we got you.

ADAMS: (Laughter)

LOVELL: We got the best thing going, right, Vern?

PIXLEY: Ain't no joke. A new desk, typewriter, couch.

Rec. vol. III, doc. 6 (Pixley Supp. Affidavit at 4–5). Of course, the defendants have offered explanations to refute the apparent meaning of the above. That task, however, is best left to the trier of fact. There is ample evidence in this record to indicate that Adams behaved as a government agent with the encouragement and acquiescence of defendants Lovell, Pixley and Hyatt.

To be sure, there is contrary evidence. Adams approached the IRS and volunteered information. She later decided to accept an offer of employment with the NCBA and continued to provide the IRS with information. Adams initiated her trash delivery system after her responsibilities at the NCBA office expanded. And to a limited extent, Adams decided what documents or items to provide to the government, and when. On one occasion, she provided a tape recording even though the agents had declined her offer to obtain it. Rec. vol. II, doc. 5, pl. ex. 3 (file memo of 11/14/79). But because the documentary and testimonial evidence and the inferences therefrom sharply conflict on whether Adams was acting as an instrument or agent of the government, summary judgment in favor of the defendants based on the lack of an agency relationship was inappropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (summary judgment not appropriate when credibility must be assessed and evidence weighed to resolve a material factual dispute); *Roth v.*

*V.A.*, 856 F.2d 1401, 1408–09 (9th Cir.1988) (disputed factual issues concerning underlying events may preclude summary judgment on qualified immunity grounds).

In the dissenting portion of his separate opinion, Judge McKay suggests that the agency issue ought to be decided as a matter of law. The dissent makes two arguments: 1) that an agency determination should not be a jury matter, and 2) that even if it was a proper jury matter, it should not be in this case because a directed verdict should be granted, holding that Adams functioned as a government agent. We cannot agree with either contention. Although the entire panel is in agreement that the defendants are not entitled to qualified immunity on this issue, the panel majority believes that the ultimate resolution of the agency question in this case should be left to the trier of fact.

In the § 1983 context, the dissent observes that district courts sometimes decide agency issues in civil rights cases and always do in criminal cases, insofar as suppression hearings are concerned. Concurring and Dissenting Opinion at 807–808. From this the dissent reasons that an agency determination in a civil rights case should be decided by the court, not the jury. *Id.* Not so.

■■■ A private person may act under color of state law if she is a willful participant in a joint activity with the state or its agents. *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966). However, the question of whether a private person acts under color of state law is one of fact and normally a jury matter, unless it may be decided as a matter of law under Fed.R.Civ.P. 12(b)(6) (e.g., plaintiff has failed to allege facts which would show that private person was acting in concert with state official; dismissal for failure to state a claim appropriate) or under Fed.R.Civ.P. 50 or 56 (e.g., facts and their inferences admit of but one conclusion concerning whether private person was acting under color of state law; summary judgment or directed verdict or j.n.o.v. appropriate). Two of the cases relied upon in the dissent, Concurring and Dissenting Opinion at 807, n. 2, merely involve situations where courts were able to resolve the issue as a matter of law. This does not mean, however, that where the facts are disputed, the color of state law inquiry would be resolved by the court rather than by the jury. *See* 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice & Instructions § 103.05 (4th ed. 1987) (jury instruction concerning agency between government official and private actor).

Turning to the cases relied upon in the dissent, *Creamer v. Porter*, 754 F.2d 1311 (5th Cir.1985), does not involve a question of whether a private person was acting as a government agent. It also is different procedurally than this case. In a bench trial, the district court dismissed two defendant sheriff's deputies from a civil rights action, characterizing them as "bystanders" while an unreasonable search and seizure occurred. The court of appeals reviewed the district court's findings on this issue and reversed in part under the clearly erroneous standard, Fed.R.Civ.P. 52(a), holding that only one of the deputies was entitled to be dismissed after considering evidence of knowledge and participation. *Id.* at 1316–17. Because *Creamer* involved a bench trial, it is difficult to say with confidence that the issue of the deputies' participation was one of law. The appellate court's reliance on the clearly erroneous standard suggests that this factual issue was decided by the court because the court was the trier of fact.

*Wagner v. Metropolitan Nashville Airport Auth.*, 772 F.2d 227, 229 (6th Cir. 1985), involves a grant of summary judgment in which the court reviewed the legal relationship between an airport authority, Delta Airlines, which leased space from the airport authority, and a security contractor hired by Delta Airlines. Plaintiffs contended that a security contractor hired by Delta Airlines had performed an unreasonable search of their baggage. The grant of summary judgment in favor of the defendants was affirmed after the court reviewed the applicable federal regulations and the operating arrangement among the

entities. *Id.* at 229–30. The requisite state action required for a § 1983 suit was missing. *Wagner* seems particularly suited for summary judgment because, unlike the present case, it did not involve conflicting accounts of the relationship between the government entity and the private actors.

Finally, in *King v. Massarweh*, 782 F.2d 825 (9th Cir.1986), plaintiffs sued a landlord, various police officers, and the municipality based on an incident which began when the landlord sought to have various plaintiffs removed as trespassers. The court considered whether the landlord's actions were sufficiently connected with the state action involved. The court of appeals affirmed the dismissal of the landlord (apparently on summary judgment) because the landlord merely called the police and there was no indication that the landlord "asserted any control" concerning the officers' conduct which was challenged as unconstitutional. *Id.* at 829. In the case before the court, the agency inquiry is not nearly as straightforward because of the presence of conflicting accounts of what happened. It is partly because the "defendants may put a different gloss on the testimony," Concurring and Dissenting Opinion at 808, particularly concerning intent, that we do not resolve this issue as a matter of law.

### VI.

### A.

The defendants contend that they are entitled to qualified immunity even if Adams was found to be a government agent by a jury. The district court agreed and granted qualified immunity to defendants Lovell, Pixley and Hyatt on grounds which we must reject. The district court concluded that if Adams was a government agent, there was no clear law "that a person who specifically instructs another person to take trash home and burn it retains an expectation of privacy in that trash." Rec. vol. III, doc. 11 at 25. In *Calfornia v. Greenwood,* — U.S. ——, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), the Court held that the fourth amendment does not proscribe searches and seizures of trash placed in an

area accessible to the public for collection. *Id.* at 1628. The Court reasoned that placing garbage on or near a public street for collection is inconsistent with an objectively reasonable expectation of privacy in the garbage. *Id.* at 1628–29.

In this case, it is apparent that the federal defendants viewed any trash removed from the NCBA offices as beyond the protection of the fourth amendment, without consideration of the means of disposal. Though we agree with the conclusion that the NCBA members did not have a reasonable expectation of privacy in the *actual* trash, we do so for different reasons than the district court. Moreover, because not every item taken by Adams was trash, the effect of this conclusion cannot be a grant of qualified immunity to the defendants for all of their actions.

In 1979, those federal appellate courts which had decided the issue uniformly held that trash placed for collection in a location accessible to the public was without fourth amendment protection. *United States v. Crowell*, 586 F.2d 1020, 1024–25 (4th Cir. 1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979); *United States v. Shelby*, 573 F.2d 971, 973–974 (7th Cir.), *cert. denied*, 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978); *Magda v. Benson*, 536 F.2d 111, 112 (6th Cir.1976); *United States v. Mustone*, 469 F.2d 970, 972–73 (1st Cir. 1972); *United States v. Dzialak*, 441 F.2d 212, 215 (2d Cir.), *cert. denied*, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971); *United States v. Minker*, 312 F.2d 632, 634–35 (3d Cir.1962), *cert. denied*, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963). As explained by the Fourth Circuit:

[A]bsent proof that a person has made some special arrangement for the disposition of his garbage inviolate, he has no reasonable expectation of privacy with respect to it once he has placed it for collection. The act of placing it for collection is an act of abandonment and what happens to it thereafter is not within the protection of the fourth amendment.

*Crowell*, 586 F.2d at 1025. But given the facts of this case, this rule does not com-

pletely shelter the removal of NCBA materials by Adams.

First, Adams did not remove only trash from the NCBA offices; she also removed a large mailing list, a cassette tape, and several affidavits which plainly were not trash. Second, it is unclear how much of the "trash" that was removed was in fact bona fide trash. Adams' comments seem to indicate that, at times, she was creating trash.[3] And certain comments by defendants Lovell and Pixley support the inference that they condoned,[4] and even encouraged,[5] Adams to create trash so that it

3. Adams provided documents pertaining to the activities of one Don Turner. The following exchange between Adams and defendants Lovell and Pixley took place:

> LOVELL: What have you got back there now, TURNERS'?
> ADAMS: See this little old thing here?
> LOVELL: Yeah.
> ADAMS: That's TURNER's operation.
> PIXLEY: In a nutshell, huh? Is that prospectus?
> ADAMS: Pardon?
> LOVELL: The American Law Association presents for additional discussion and analysis the Workshop Principles.
> ADAMS: Now those are out of order, deliberately. Punched on the wrong side, deliberately. Thrown in the trash.
> PIXLEY: Sun [sic]-of-a-gun. Tell you, you can't hardly get good secretarial help any more.
> ADAMS: Laughter.
> LOVELL: How about that.
> PIXLEY: Trash, trash, dog gone, just creating trash.
> ADAMS: You just don't give that out to anybody.

Rec. vol. I, doc. 3, ex. A, attachment A, tape 1 tr. at 14–15.

4. Adams supplied several documents from the NCBA office, apparently not in the correct order. Defendants Lovell and Pixley questioned Adams about the documents:

> LOVELL: Who wrote up there [sic] secret tax return?
> ADAMS: That's, ah, DON's handwriting. But see, those aren't in order.
> PIXLEY: A limited power of attorney.
> ADAMS: But there in, I mean, you know, I, I had to do that in such a way so I could get it thrown in the trash.
> LOVELL: Good thinking.
> ADAMS: I'm sorry about that.

Rec. vol. I, doc. 3, ex. A, attachment A, tape 1 tr. at 18. This was not the only time that Adams delivered mixed-up documents in her haste to get the documents out of the NCBA office and into the hands of the agents. *See* rec. vol. V, pl. ex. 2–C at 8.

5. Defendant Lovell questioned Adams about the existence of files in the NCBA office concerning the Commodity Barter Association, Committee of 200,000, and a person named Applegar. Adams responded that she would have to look in the blue book maintained by Grandbouche. Lovell asked her again:

> ADAMS: I've heard the name from other sources, that, you know, from reading in the paper but uh, I've heard, well in that blue book there's uh, which I haven't been able to get out, cause it can't go in the trash, that has maybe three hundred names in it or better.
> LOVELL: Blue book?
> PIXLEY: What's that suppose [sic] to be?
> ADAMS: That part of the, its a barter and, and, uh, uh, people that he's actually dealing with. Now that, I've looked in it and HUDSON's name is, I mean uh, HOLMAN's is not in that. But it's all these other people that he has coming to his house.
> LOVELL: What do [you] mean he has additional name, names in addition to the what the ones we already now [sic] about?
> ADAMS: Yes. It's a book.
> PIXLEY: Where does he keep the blue book?
> ADAMS: It's a ledger, it's in the, its [sic] in the file drawer. And pulls that out every once in a while, but it's a book just about like so and its uh bout [sic] 4 by 5 cards you know 4 by 5 cards, ledger cards.
> LOVELL: What happens?
> PIXLEY: He leaves it there when he's out of town?
> ADAMS: Yes.
> PIXLEY: When DON's out of town?
> ADAMS: Um-huh.
> PIXLEY: Now it's probable [sic] going to end up in the trash, isn't it?
> ADAMS: Okay.

Rec. vol. I, doc. 3, ex. B, attachment A, tape 2 tr. at 5–6. In another exchange, defendant Pixley asked whether he should tear pages out of some document brought by Adams.

> PIXLEY: You want me to tear those pages out of there?
> ADAMS: Pardon?
> PIXLEY: Tear those pages out of there.
> ADAMS: Can I duplicate'em?
> PIXLEY: Yeah, okay.
> ADAMS: Well [sic] that be alright?
> PIXLEY: Yeah.
> LOVELL: Aaaaa.
> ADAMS: If not I can tear 'em out.
> PIXLEY: Na, that's alright, go ahead wait to fill your book up, and throw it away.
> ADAMS: And then throw it away.
> LOVELL: Moan.
> PIXLEY: But you can go ahead and duplicate the paper.
> ADAMS: Oh, okay.

*Id.* at 17–18.

could then be shared with the government. Third, the trash involved here was not set out in a public place for collection. Adams' NCBA supervisor, John Grandbouche, was reluctant to let others into the office and gave Adams the specific duty of burning the trash, probably to avoid what occurred here. *See* rec. vol. I, doc. 3, ex. A (Adams depo. 10/27/83). Thus, assuming *arguendo* that Adams was a government agent, qualified immunity for all the activities in question would be inappropriate.

■ Fourth amendment protection of office papers and other items was clearly established in 1979. *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 352–53, 97 S.Ct. 619, 628–29, 50 L.Ed.2d 530 (1977); *See v. City of Seattle*, 387 U.S. 541, 546, 87 S.Ct. 1737, 1741, 18 L.Ed.2d 943 (1967); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 356–58, 51 S.Ct. 153, 157–58, 75 L.Ed. 374 (1931). Whether discarded documents were entitled to fourth amendment protection turned on whether the method of discarding could support a reasonable expectation of privacy. Here, defendant Lovell has acknowledged that the method of discarding the trash in this case was purposely adopted for privacy.

> On November 1, 1979, Pauline Adams phoned me and explained that John Grandbouche had assigned her the responsibility of taking home and destroying his office trash. She said that Grandbouche did not want his office trash dumped into the building dumpster because it could result in some one [sic] person finding out about his activities. She said that Grandbouche had asked her to take the office trash to her home and burn it in her fireplace since he did not have a fireplace in his home.

Rec. vol. I, doc. 3, ex A, ¶ 60 at 18 (Lovell affidavit). Thus, Adams informed the government of the steps taken by Grandbouche to secure the NCBA trash. We think it was clear that one who takes steps for the secure disposition of trash by a method reasonably calculated to avoid snooping can have a reasonable expectation of privacy in the trash. This case does not involve trash placed at curbside for collec-

tion. Accordingly, we reject the district court's rationale for granting qualified immunity and conclude that should the trier of fact determine that Adams was a government agent, qualified immunity would be appropriate only with respect to the search and seizure of items which were bona fide trash for reasons we discuss below.

### B.

If Adams was a government agent operating undercover, her review and removal of NCBA documents and other items would not constitute a search or seizure subject to the fourth amendment if she was given complete access to and control of these items by the NCBA, as her employer. *See Maryland v. Macon*, 472 U.S. at 468–70, 105 S.Ct. at 2781–82 (undercover law enforcement officer may purchase allegedly obscene materials from adult bookstore without implicating the fourth amendment; officer merely doing what public at large may do). Thus, if her employer entrusted her with the removal and destruction of trash, the fourth amendment would not be a bar to her sharing that trash with other government agents.

■ The government may resort to artifice and stratagem to disclose violations of the law. *Sorrells v. United States*, 287 U.S. 435, 441–42, 53 S.Ct. 210, 212–13, 77 L.Ed. 413 (1932). It has long been recognized that the government is "entitled to use decoys and conceal the identity of its agents." *Lewis v. United States*, 385 U.S. 206, 209, 87 S.Ct. 424, 426, 17 L.Ed.2d 312 (1966). Thus, an undercover agent may gain entry to a person's home by deception and purchase narcotics with no violation of the fourth amendment. *Id.* at 210, 87 S.Ct. at 427. When the undercover agent behaves in an objectively reasonable fashion given the scope of the invitation, no reasonable expectation of privacy has been infringed. Merely because a person unwisely reposes trust in what later turns out to be a government agent does not mean that the agent's covert conduct is actionable under the fourth amendment. *Alderman v. United States*, 394 U.S. 165, 179 n. 11, 89

S.Ct. 961, 969 n. 11, 22 L.Ed.2d 176 (1969); *Hoffa v. United States*, 385 U.S. 293, 302–03, 87 S.Ct. 408, 413–14, 17 L.Ed.2d 374 (1966). For the teaching of a verse is also true in the law: "Do no secret thing before a stranger; for thou knowest not what he will bring forth." Ecclesiasticus 8:18 (Apocrypha). But an undercover agent who gains entry for an isolated purpose may not make a secret warrantless inspection and remove every document and item to be found. *Gouled v. United States*, 255 U.S. 298, 305–06, 41 S.Ct. 261, 263–64, 65 L.Ed. 647 (1921).

■ It is uncontroverted that Adams befriended various NCBA members and was taken into their confidence. Grandbouche employed her, and she was granted access to some NCBA materials. Most of the documents were turned over to Adams voluntarily by her NCBA employers with instructions that she take them home and destroy them. Thus, to the extent that they participated with or encouraged Adams as their agent, the defendants would be entitled to qualified immunity regarding the consequences of: 1) her review of documents and tapes to which she was allowed access by the NCBA, and 2) her review and removal of bona fide trash from the NCBA offices. Stated another way, no clearly established law would preclude the defendants from participating with or encouraging Adams to provide the government with her observations and physical evidence, provided she stayed within the scope of her inherent authority at the NCBA.

C.

■ If a jury determines that Adams was a government agent, the constitutional problem in this case occurred when Adams strayed beyond the scope of her appointed tasks at the NCBA and began inspecting and removing documents and other items which she lacked the inherent authority to inspect and remove. The plaintiffs have met their burden in identifying evidence which tends to prove that Adams went beyond her role as an undercover secretary and that she was assisted by defendants

Lovell and Pixley in so doing. *See* n. 3–5, *supra*. As noted, the defendants received a large mailing list, a cassette tape, and several affidavits which plainly were not trash. Indeed, defendant Lovell testified on deposition that he knew that several items delivered by Adams, including the affidavits were not trash. Rec. vol. VI, pl. ex. 15 at 83, 85 (Lovell depo. 1/9/86). Plaintiffs have come forward with competent evidence which suggests that defendants Lovell and Pixley encouraged Adams to stray beyond her apparent duties at the NCBA and create trash. *Id.*

The first amendment does not protect against investigation of suspected criminal activity, but as a safeguard, the requirements of the fourth amendment must be applied with " 'scrupulous exactitude.' " *Zurcher v. Stanford Daily*, 436 U.S. 547, 564, 98 S.Ct. 1970, 1981, 56 L.Ed.2d 525 (1978) (quoting *Stanford v. Texas*, 379 U.S. 476, 482, 85 S.Ct. 506, 510, 13 L.Ed.2d 431 (1965)). If Adams was operating at the control and direction of the government, the requirement of strict compliance with the fourth amendment (i.e. obtaining a warrant) should have been apparent to reasonable special agents in 1979. While Adams could search those items to which she reasonably had access, a reasonable special agent should have been aware of the warrant requirement of the fourth amendment insofar as it regards Adams' seizure of property, much of it protected by the first amendment. *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525; *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431; *Marcus v. Search Warrant*, 367 U.S. 717, 729, 731, 81 S.Ct. 1708, 1714, 1715, 6 L.Ed.2d 1127 (1961); *see LeClair v. Hart*, 800 F.2d 692, 694–96 (7th Cir.1986) (law was clearly established that special agents of the IRS could not go beyond terms of search warrant and copy all financial records when warrant was far narrower). Contrary to the government's position, it would make little difference that the items which Adams provided were not used if those items were obtained in violation of the fourth amendment. *Katz v. United States*, 389 U.S. at 356–57, 88 S.Ct. at 514–15. The evidence that plain-

tiffs have produced strongly supports the inference that circumvention of the warrant requirement of the fourth amendment was contemplated, and on these facts it should have been apparent to a reasonable special agent. Thus, we cannot agree with the district court that blanket qualified immunity for defendants Lovell, Pixley and Hyatt would be appropriate if Adams was deemed to be an instrument or agent of the government. Instead, we hold that these defendants are entitled to qualified immunity regarding the activities of Adams only insofar as her activities were within the inherent scope of her clerical duties at the NCBA.

## VII.

Plaintiffs also contend that the defendants conspired to deprive the plaintiffs of their first amendment speech and associational rights. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). We have recognized that these types of claims are more difficult to resolve under the *Harlow* standard because they involve a subjective element, namely the motivation of governmental defendants. *Pueblo Neighborhood Health Centers v. Losavio*, 847 F.2d at 647–48. We have determined that defendants Lovell, Pixley and Hyatt are entitled to qualified immunity regarding those actions of Adams which ostensibly were within the scope of her authority at the NCBA, such as removal of bona fide trash. Qualified immunity does not extend to liability for the activities of Adams which were plainly beyond her authority. In view of this conclusion and for reasons we discuss below, summary judgment on the conspiracy claim against these defendants was not appropriate.

The plaintiffs have met their burden of identifying specific evidence which could show that the actions of these defendants were improperly motivated. *See id.* In a conversation monitored and recorded by the defendants in October 1979, NCBA founder Grandbouche had a discussion with Adams concerning the affidavits completed by supporters of the Committee of 200,000 to Save the State of Colorado:

> GRANDBOUCHE: Now this one here is a fellow by the name of Bascom. Now the way these affidavits work, they mail 'em to us—and I'm not gonna take this with me—I don't want these ever to leave this office.
>
> ADAMS: Uh-huh.

Rec. vol. V, pl. ex. 2–A. In November 1979, Adams delivered the original affidavits, including the one by Mr. Bascom. *Id.*, pl. ex. 5. Defendants Lovell and Pixley then proceeded to copy the original affidavits, store the copies and make no further use of them. Rec. vol. I, doc. 3 ex. A, ¶ 62(f) at 22 (Lovell affidavit); *id.* ex. B, ¶ 26(f) at 13. The government agents were informed through consensual monitoring that the affidavits were confidential and, as noted, defendant Lovell indicated that he knew they were not trash. Yet the agents proceeded to copy these affidavits which are plainly political speech.

The record is replete with evidence which would support the plaintiffs' claim that defendants Lovell, Pixley and Hyatt were seeking to gather as much information on the NCBA as possible, including the identities and activities of its members. Defendants, through Adams, gathered letters, correspondence, textbooks and instructional materials. Rec. vol. V, pl. ex. 1–L. There is evidence which suggests, despite the claims of these defendants to the contrary, that Adams was instructed to remove this information by creating trash. Much of the information gathered has no demonstrated law enforcement value, but regardless, this type of activity may constitute governmental interference with the freedom to associate and the privacy in one's associations. *See Gibson v. Florida Legislative Investigation Committee*, 372 U.S. at 544, 83 S.Ct. at 892. Indeed, the plaintiffs have submitted evidence indicating that various NCBA members are now reluctant to associate with the group. At the same time, we recognize that some interference may be permissible when the government can demonstrate a compelling interest, such as good-faith criminal investigation that is narrowly tailored to detect

information concerning tax evasion. *In re Grand Jury Proceeding*, 842 F.2d at 1236.

We also acknowledge that certain NCBA members were aware that IRS agents were registering and attending NCBA seminars on the tax system. Rec. vol. I, doc. 3, ex. F (Thompson affidavit). The agents were familiar with the positions advocated by the NCBA speakers insofar as they urged willful noncompliance with the tax laws. The special agents also were aware of various unlawful schemes designed to avoid tax promoted by the NCBA. These factors, however, would not excuse compliance with clearly established first and fourth amendment law. The value of the warrant requirement of the fourth amendment is apparent in this case.

### VIII.

Having decided that the claims against defendants Lovell, Pixley and Hyatt cannot be resolved fully on qualified immunity or other grounds, we turn to plaintiffs' remaining contentions. Plaintiffs contend that the district court erred in holding that defendant Batson's technical assistance during the consensual monitoring of various NCBA members was not actionable. Regarding defendants Batson and Fortune, plaintiffs also contend that the district court erred in holding that their conduct on behalf of the grand jury likewise was not actionable.

### A.

■■■ Defendant Fortune provided technical assistance for the consensual electronic monitoring of the NCBA offices in October 1979. The consent of Adams was obtained, and the defendants received Department of Justice and IRS approval prior to initiating the electronic surveillance, although the failure to do so would not implicate the fourth amendment. *United States v. Caceres*, 440 U.S. 741, 751–52, 99 S.Ct. 1465, 1471, 59 L.Ed.2d 733 (1979). It is plain that this activity did not violate the

fourth amendment rights of NCBA members. There is statutory authority[6] for consensual monitoring, and the Court repeatedly has held that it does not violate fourth amendment interests. *United States v. Caceres*, 440 U.S. at 750–51, 99 S.Ct. at 1470–71; *United States v. White*, 401 U.S. 745, 750, 91 S.Ct. 1122, 1125, 28 L.Ed.2d 453 (1971).

Plaintiffs contend that the lawfulness of the consensual monitoring activities under the fourth amendment is immaterial for purposes of their first amendment claim. We cannot agree; but in any event, the defendants would be entitled to qualified immunity. When the electronic surveillance occurred, the defendants were investigating a threat against a federal judge about to preside in a criminal tax trial. No fourth amendment interest was compromised and the government had a compelling interest in investigating the matter and taking appropriate action.

### B.

■■■ To the extent that defendants Batson and Fortune assisted the federal prosecutors by serving grand jury subpoenas, their actions are absolutely immune as "associated with the judicial phase of the criminal process." *See Imbler v. Patchman*, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976) (prosecutors initiating a prosecution and presenting the government's case are entitled to absolute immunity); Fed.R.Crim.P. 6(e)(3)(A)(ii) (disclosure of grand jury matters may be made to government personnel assisting government attorney). Absolute immunity, however, would not extend to investigative and administrative activities of the agents, even if they were assisting the federal prosecutors. *See Imbler v. Patchman*, 424 U.S. at 430–31, 96 S.Ct. at 994–95; *Lerwill v. Joslin*, 712 F.2d 435, 437 (10th Cir.1983). Thus, to the extent that plaintiffs are arguing that the investigative activities of defendants Fortune and Batson are implicat-

---

**6.** 18 U.S.C. § 2511 provides in pertinent part: (c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral or electronic communi-

cation, where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception.

ed, the qualified immunity standard would be appropriate. *Liffiton v. Keuker,* 850 F.2d 73, 78 (2d Cir.1988).

Applying this standard, we hold that defendants Batson and Fortune would be entitled to qualified immunity while assisting the government prosecutors with a grand jury investigation. It must be remembered that the investigative activities of defendants Batson and Fortune on behalf of the grand jury were aimed at disclosing violations of the federal tax code such as the failure to report income. The plaintiffs simply have not produced evidence which indicates that either defendant violated clearly established law while assisting the grand jury and investigating various NCBA members. *See In re Grand Jury Proceeding,* 842 F.2d at 1236.

### C.

The final issue we discuss concerns plaintiffs' claim that defendant Batson should be held liable because he served a grand jury subpoena on a bank with NCBA records and advised the bank that it need not notify its customer of the subpoena. The Right to Financial Privacy Act, 12 U.S.C. §§ 3401–3422, places strict limitations on a grand jury's use and retention of bank customer financial records, 12 U.S.C. § 3420, and also requires that a copy of a judicial subpoena be served upon the customer or mailed to his last known address, 12 U.S.C. § 3407. But, the Act does not apply "to any subpena or court order issued in connection with proceedings before a grand jury." 12 U.S.C. § 3413(i). Thus, a bank is not required to notify its customer of a grand jury subpoena. Indeed, as amended in 1986, § 3413(i) now provides that under certain conditions a court may order a bank *not* to disclose to the customer the existence of the grand jury subpoena or the information that the bank provided. *See* 12 U.S.C. § 3409.

The Act was passed in response to *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), in which the Court decided that under the fourth amendment, a bank customer does not have a reasonable expectation of privacy in bank records concerning his account; accordingly, a subpoena to a third-party bank will not implicate the fourth amendment. *Id.* at 442–445, 96 S.Ct. at 1623–25; H.R.Rep. No. 1383, 95th Cong.2d Sess. 34, *reprinted in* 1978 U.S.Code Cong. & Admin.News 9273, 9306. It is clear from the House Report that Congress sought to provide a statutory right to privacy in bank records of certain persons and entities. H.R.Rep. No. 1383 at 34, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 9306.

A bank may comply with a grand jury subpoena for a customer's bank records by turning over those records to an agent of the grand jury. *United States v. A Residence Located at 218 Third St.,* 805 F.2d 256, 260–61 (7th Cir.1986), *United States v. Kington,* 801 F.2d 733, 736 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 495 (1987). Under the Act, there is no requirement that a bank notify its customer of a grand jury subpoena. Given this fact, plaintiffs cannot contend that defendant Batson's advice to the bank violated any clearly established right.

Instead, the plaintiffs rely on the first amendment and our decision concerning this same subpoena in which we held that the district court must hold an evidentiary hearing to determine whether enforcement of the subpoena would chill associational rights. *In re First Nat'l Bank,* 701 F.2d at 118–19. If so, the district court would be required to balance the first amendment interests of the NCBA members against the grand jury's need for the information, and consider narrowing the subpoena. *Id.* at 119. We are informed by the government that this balancing did not occur, presumably because the government did not pursue enforcement of the subpoena. Appellees' Brief at 41–42. On the other hand, plaintiffs contend that because of defendant Batson's actions, "the defendants, and other IRS special agents assigned to assist the grand jury, were able to identify between 100 and 200 NCBA members, supporters and associates, who were then contacted and interrogated concerning their membership in and knowledge and/or support of the NCBA, its

members and their philosophy." Appellants' Brief at 41. We have reviewed the exhibits referenced by plaintiffs which ostensibly support this claim; however, we cannot find the link between these particular bank records and the investigative activities on behalf of the grand jury conducted by defendants Fortune and Batson. In any event, defendant Batson has absolute immunity for the actual service of the ' grand jury subpoenas. It is uncontroverted that defendant Batson served the subpoena on the bank at the direction of the prosecutor who would be entitled to absolute immunity for such an action. *See T & W Inv. Co., Inc. v. Kurtz*, 588 F.2d 801, 802–03 (10th Cir.1978) (receiver acting at direction of judge entitled to absolute immunity). Defendant Batson would be entitled qualified immunity for advising the bank not to notify its customer of the subpoena. Essentially, plaintiffs are requesting that we find a clearly established right of customer notice when grand jury subpoenas are served on banks and first amendment concerns are implicated. This we cannot find. We note that without such a right plaintiffs were able to challenge the subpoena in another proceeding and to prevail. *In re First Nat'l Bank*, 701 F.2d 115.

## IX.

We hold that defendants Lovell, Pixley and Hyatt are not entitled to qualified immunity on the theory that the law was not clearly established in 1979 concerning whether informant Adams would be viewed as a government agent. Whether Adams acted as a government agent is a question of fact which must now be resolved by the trier of fact. We further hold that, should the trier of fact determine that Adams was a government agent, these defendants would be entitled to qualified immunity regarding information and documents relayed by Adams, if she obtained them within the inherent scope and course of her

secretarial duties for the NCBA. Again, the evidence is controverted on this point.

Those special agents who served grand jury subpoenas are entitled to absolute immunity for such service. Defendant Fortune has qualified immunity for his technical consensual monitoring assistance; no clearly established first or fourth amendment right was violated. To the contrary, the activity is beyond the scope of the fourth amendment. Defendant Batson cannot be held liable for advising the bank not to notify the plaintiffs of a grand jury subpoena for bank records in response to the bank's inquiry. Defendant Batson is not liable for his comment on grounds of qualified immunity. We cannot say that a bank customer had a clearly established right to notification of such a grand jury subpoena even if first amendment concerns were implicated. Finally, defendants Batson and Fortune are entitled to qualified immunity based on their investigative activities on behalf of the grand jury.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

McKAY, Circuit Judge, concurring in part and dissenting in part:

I agree wholly with the majority opinion with one exception: whether Ms. Adams was acting as a government agent when she took documents from the plaintiffs and gave them to the government. I cannot agree that we must remand that determination to the trier of fact. I believe that the evidence fully supports a directed verdict in favor of plaintiffs on the issue of Ms. Adams' agency.

All of the cases cited by the majority where an "agency" determination is made are criminal cases in which the court decides the issue on a motion to suppress.[1] In all of the section 1983 cases I can find, the court has made the determination but has never discussed the allocation of function between judge and jury where credibil-

1. *See United States v. Miller*, 688 F.2d 652 (9th Cir.1982); *United States v. Walther*, 652 F.2d 788 (9th Cir.1981); *United States v. Snowadski*, 723 F.2d 1427 (9th Cir.1984); *United States v. Lamport*, 787 F.2d 474 (10th Cir.1986); *United States v. Black*, 767 F.2d 1334 (9th Cir.1985); *United States v. Veatch*, 674 F.2d 1217, 1221–22 (9th Cir.1981); *United States v. Gumerlock*, 590 F.2d 794 (9th Cir.1979).

ity is at issue.[2] Here, the uncontested facts seem to me to establish as a matter of law that the relationship had passed well over the threshold required to make Ms. Adams a government agent for section 1983 purposes. In any event, if the court in a criminal suppression hearing can make the determination of agency for purposes of determining whether the evidence was seized in violation of the Fourth Amendment, it would seem illogical to allocate that function to the jury in a section 1983 civil case where the legality of the search is at issue.

The majority states that "the defendants have offered explanations to refute the apparent meaning of [some of the testimony]." Maj. op. at 798. The defendants may put a different gloss on the testimony, but there are apparently no subsidiary or historical facts in dispute that would call for a jury determination. When the facts are not at issue—but merely whether these facts amount to the legal determination that one is an agent—such determination is properly made by the court.

I would hold as a matter of law that Ms. Adams was an agent, for Fourth Amendment purposes, at the time she took the documents. Because in my view it is abundantly clear that Ms. Adams was acting as a government agent, the defendants are not entitled to qualified immunity on that issue.

---

**2.** *See Creamer v. Porter,* 754 F.2d 1311 (5th Cir.1985) (issue for the court whether officer was a mere "bystander" or participated in search); *Wagner v. Metropolitan Nashville Airport Auth.,* 772 F.2d 227 (6th Cir.1985) (issue for the court whether action taken by private individuals may be "under color of State law" when significant state involvement attaches to the action); *King v. Massarweh,* 782 F.2d 825 (9th Cir.1986) (issue for the court whether landlord was a "joint actor" of the state when he called police in to search plaintiff's apartment).