974 F.2d 1222
 71 A.F.T.R.2d 93-1706
 John S. PLEASANT; Lewis G. Allen; Eldon D. Anthony;
Robert J. Athey; Irvin Austin; Joe O. Baker; Carlton E.
Bowser, Sr.; Brett J. Brough; John T. Bryant; Craig
Buchanan; Thomas J. Chase; John L. Cheek; Milan A. Cicak,
Sr.; John R. Clark; Donald H. Coats; William T. Conklin;
Martin J. Cote; Daniel E. Dack; Herman L. Dearing; Glenn
R. Dobey; Cecil L. Eisler, Jr.; Andrew J. Evanko;
Franklin Thomas Fiedler; Arthur E. Filis; John A. Fisher;
Floyd J. Fitch; Joanna Grandbouche; Johnie F. Hale, Jr.;
Elijah N. Hall; Thomas H. Hanson; Robert Hawley; William
L. Hayes; William H. Hedden; Wil Hendrickson; Jon R.
Hoyt; Annie Lee Hudson; Bob Huebner; Garry Lee Johnson;
Eugene J. Karlin; William Kizziar; Verland G. Kliven;
Frank Kowalik, Jr.; Karen Kowalik; Charles J. Krall;
Kenneth Krausnick; Dan J. Kronemeyer; Ruby Larkins, as
personal representative for the estate of Larry G.
Larkins; Arthur Lawrence; Arno T. Liebelt; Jerry L.
Manka; Delmar Mehring; William A. Mertsching; Consuelo D.
Milburn; J.P. Miller; Judson L. Morris; Ray E. Mulhbach;
Floyd McElwain; David W. Niemela; Lorentz Opdahl; Evelyn
M. Page; Earl L. Peterie; Eric J. Phelps; Lawrence
Phillips; Richard R. Phillips, Jr.; Melanie Pleasant;
Harold L. Pottorf; Virginia L. Quinn, as personal
representative for the estate of Paday T. Quinn, Sr.;
Franklin T. Fiedler, as personal representative for the
estate of Jay Ross; Steven Rothacker; William B. Smith,
Jr.; Wilmont Smith; Mary G. Spurgeon; Robert E. Spurgeon;
John A. Voss; Sharon Voss; Robert J. Wagner; Steven
Wagner; Donald E. Wishart; Floyd A. Wright; Lucian T.
Zell, II, Plaintiffs-Appellants,
v.
Larry LOVELL; Vernon Pixley; Larry Hyatt, Defendants-Appellees.
 No. 90-1314.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 6, 1992.
 
 William A. Cohan (Jennifer A. Greene, also of Cohan & Greene, Encinitas, Cal., and John S. Pleasant, Englewood, Colo., pro se, with him on the briefs), for plaintiffs-appellants.
 John J. McCarthy, Atty., Tax Div., (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Jonathan S. Cohen and Charles M. Duffy, Attys., Tax Div.; Michael J. Norton, U.S. Atty., of counsel; and William G. Pharo, Asst. U.S. Atty., with him on the brief), U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.
 Before LOGAN and BRORBY, Circuit Judges, and DAUGHERTY, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 Plaintiffs, members of an organization known as the National Commodity and Barter Association (NCBA), appeal a judgment against them following a bench trial. Plaintiffs' action alleged First and Fourth Amendment violations by defendants, who are Internal Revenue Service (IRS) agents. In a prior appeal, Pleasant v. Lovell, 876 F.2d 787 (10th Cir.1989), we reversed in part a grant of summary judgment against plaintiffs and remanded for trial.
 
 
 2
 * The facts are recited in our prior opinion, see 876 F.2d at 789-93, and we summarize them only briefly. In 1979 the Criminal Investigative Division of the IRS was investigating John Grandbouche, the founder and leading figure of the NCBA, and various groups involved in the tax protest movement. In September 1979 a private citizen, Pauline Adams, called the IRS and spoke with defendant Lovell. Adams was in contact with Grandbouche, plaintiff Pleasant, and other members of a group called Posse Comitatus. During the course of her contact with these individuals, Adams reportedly overheard discussions concerning activities that included intimidation of IRS personnel. Adams offered to disclose this information to the IRS. Defendant Lovell met with Adams, and the IRS classified her as a restricted source confidential informant. See I Addendum to Brief for Appellees (Addendum), ex. W at 1-4.
 
 
 3
 In October 1979 Adams took a clerical position working for Grandbouche and the NCBA, and she continued to provide information to defendants. At one time, after obtaining Justice Department authorization, the IRS electronically monitored the conversations of Grandbouche and his associates with the assistance of Adams. The electronic monitoring was short in duration and was discontinued for lack of evidence.[1]
 
 
 4
 Adams' contact with defendants was extensive, as summarized in our prior opinion:
 
 
 5
 In early November 1979, Adams told defendant Lovell that she had been instructed to take the NCBA's trash home and burn it. She offered to let defendants Lovell and Pixley search the trash before she destroyed it. The agents accepted her offer.
 
 
 6
 Adams had agreed to stay in daily contact with the agents. Over a seven-week period, defendants Lovell and Pixley, alone or in combination, met with Adams ten times. At these meetings, Adams provided a narrative of what the trash contained and responded to questions. Over a nine-week period, defendant Lovell had some nineteen telephone conversations with Adams concerning the activities of Grandbouche and the NCBA.
 
 
 7
 876 F.2d at 791 (record citations omitted).
 
 
 8
 In addition to the trash Adams provided to defendants, she also supplied defendants with at least three nontrash items from Grandbouche's office. These included a handwritten mailing list with several hundred names, a duplicate of a cassette tape letter by Grandbouche, and numerous affidavits by supporters of a group known as the "Committee of 200,000 To Save The State of Colorado."[2] Id.
 
 
 9
 In December 1979 Adams left her job with Grandbouche, and the IRS terminated its relationship with her. Some of the information obtained from Adams was provided to a grand jury for use in its investigation of certain tax protestors. In 1982 the grand jury proceeding terminated and none of the plaintiffs or Grandbouche were indicted.[3] Id. at 792.
 
 
 10
 In 1983, plaintiffs brought this suit alleging that defendants violated their First Amendment rights to free speech and freedom of association and their Fourth Amendment rights against unreasonable search and seizure. Plaintiffs sought damages under Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).
 
 
 11
 In the earlier appeal, reversing in part the grant of summary judgment against plaintiffs, we held that material issues of fact existed concerning whether Adams was a government agent, and if so whether the information and documents relayed by Adams were obtained within the scope of her secretarial duties with Grandbouche thereby entitling defendants to qualified immunity.
 
 
 12
 After trial, the district court ruled that Adams was not a government agent and therefore no constitutional violations occurred; and alternatively, that Adams obtained all the materials within the scope of her authority and, therefore, qualified immunity protected defendants from liability.
 
 II
 
 13
 We first consider whether the district court erred in finding Adams was not a government agent. In the first appeal we ruled that whether Adams was a government agent is a question of fact. See Pleasant, 876 F.2d at 807. We review the district court's factual determination under a clearly erroneous standard. See, e.g., Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir.1990).
 
 
 14
 "Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved 'in light of all the circumstances.' " Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 614, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989) (citations omitted). In the earlier appeal we identified two important factors to be considered: " '1) whether the government knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends.' " Pleasant, 876 F.2d at 797 (quoting United States v. Miller, 688 F.2d 652, 657 (9th Cir.1982)). Plaintiffs have the burden to establish by a preponderance of the evidence that Adams acted as a government agent. Cf. United States v. Feffer, 831 F.2d 734, 739 (7th Cir.1987) (movant at suppression hearing has burden to show private party was an agent).
 
 
 15
 The district court found that Adams was not an agent because the IRS did not control her actions; the court found that Adams acted independently and in some cases to the detriment of the IRS investigation and defendants. I R. tab 9 at 13-14 (Opinion). The district court believed that in the earlier appeal we had ruled conclusively that defendants knew of and acquiesced in the intrusive conduct. The court found, however, that Adams intended primarily to further her own ends and not to assist law enforcement efforts, and therefore she was not an agent.
 
 
 16
 We agree that defendants did not control Adams' every move and that she frequently acted independently and contrary to defendants' interests. Nevertheless, we hold that at some point Adams did become an agent of the government for purposes of the First and Fourth Amendments, and the district court's finding to the contrary was clearly erroneous.
 
 
 17
 The record supports the notion that Adams initially associated with Grandbouche and the NCBA for her own reasons and not to further law enforcement activities.[4] See I Addendum ex. X at 2 (explaining how Adams came into contact and employment with the NCBA); VI R. 929-30 (Adams' testimony explaining her motivations); see also IV R. 475 (concerning Adams' motive for contacting the government). Adams voluntarily and without the knowledge of defendants associated herself with Grandbouche and NCBA members and offered her services to them. Adams was not approached or solicited by defendants; Adams initiated contact with defendants. It was her own decision to accept a full-time clerical position with Grandbouche and the NCBA.[5] But once defendants knew Adams would provide regular access to Grandbouche's trash and other materials, and they encouraged such conduct, see II Appellants' Addendum (App.Addendum) 643, 841, Adams became an agent of the government. Cf. 1 Wayne R. LaFave, Search and Seizure § 1.8(b), at 179 (2d ed. 1987) ("It is not essential that the government official be involved in the endeavor at the very outset...."). By this time Adams clearly had the intent to assist defendants' law enforcement efforts.[6] The record indicates that defendants encouraged Adams to keep in regular contact with them, see I Addendum ex. W at 38, and to provide them with certain types of information, see II App.Addendum 800. "The variety of information obtained on this fishing expedition, the degree of supervision by the defendants, and the sheer number of contacts between Adams and defendants Lovell, Pixley and Hyatt belie the notion that Adams merely was acting as a responsible citizen and merely delivering trash to government agents." Pleasant, 876 F.2d at 798. We conclude that defendants' "encouragement, endorsement, and participation" in Adams' actions was sufficient to implicate the First and Fourth Amendments. See Skinner, 489 U.S. at 615-16, 109 S.Ct. at 1412.
 
 
 18
 Although Adams was an agent of the government for First and Fourth Amendment purposes, defendants are accountable only for her actions that they knew of or in which they acquiesced. See United States v. Bennett, 729 F.2d 923, 925 (2d Cir.) (government not responsible for informant's acts that were "in direct contravention" of special agent's instructions), cert. denied, 469 U.S. 1075, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984); United States v. Bennett, 709 F.2d 803, 806 (2d Cir.1983) (agent may exceed governmental guidelines and lose status as instrument of government); United States v. Mekjian, 505 F.2d 1320, 1326-28 (5th Cir.1975) (government not accountable for acts of informant who was specifically instructed to stop making copies of files but continued to make copies and supplied them to government). Thus, to the extent that Adams disobeyed specific instructions of defendants in her activities, she was not acting as their agent. For example, regarding the taped letter from Grandbouche to a third party, a nontrash item copied and turned over to the government, defendant Lovell had specifically told Adams to follow Grandbouche's instructions and mail it. I Addendum ex. W at 51; IV R. 478-79; VI R. 950. When Adams disobeyed this instruction, she was not acting as defendants' agent.[7]
 
 III
 
 19
 The district court found that even if Adams was defendants' agent, no First or Fourth Amendment violations occurred. We consider de novo the court's legal conclusions, see Yates v. Commissioner, 924 F.2d 967, 969 (10th Cir.1991), while we review the court's findings of facts for clear error, Las Vegas Ice, 893 F.2d at 1185; Doelle v. Mountain States Tel. & Tel., 872 F.2d 942, 944 (10th Cir.1989).
 
 
 20
 * As to the Fourth Amendment claims, the district court held that only certain plaintiffs had standing to assert them, see Order app. C, and plaintiffs do not challenge that holding. Those plaintiffs were allowed standing because their names appeared either on the seized mailing list or on the seized affidavits or both. Many of plaintiffs' Fourth Amendment claims, however, are premised upon alleged illegal seizures of Grandbouche's trash and other nontrash NCBA documents.
 
 
 21
 The Supreme Court, in a criminal context, has stated that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174, 89 S.Ct. 961, 966-67, 22 L.Ed.2d 176 (1969). "[A]n illegal search only violates the rights of those who have 'a legitimate expectation of privacy in the invaded place.' " United States v. Salvucci, 448 U.S. 83, 91-92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980) (quoting Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)). To recover for a Fourth Amendment violation in a Bivens action plaintiffs must show that they personally had an expectation of privacy in the illegally seized items or the place illegally searched. See National Commodity & Barter Ass'n, National Commodity Exch. v. Gibbs, 886 F.2d 1240, 1248-49 (10th Cir.1989).
 
 
 22
 The items allegedly seized were from Grandbouche's office. Plaintiffs did not have an expectation of privacy in, or for the most part even a knowledge of, the trash or other items removed from Grandbouche's office.[8] Grandbouche stated unequivocally in a deposition that items taken from his office, except for the mailing list which was apparently an NCBA record, were his personal records.[9] We conclude that plaintiffs had no expectation of privacy in these materials.
 
 
 23
 Regarding the mailing list and the affidavits--the basis for the district court's finding that plaintiffs had standing--the Supreme Court opinion in United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), is instructive. In Miller, a bank turned over bank records concerning depositors' accounts to the government pursuant to a subpoena. The Supreme Court found that even if the bank was acting as an agent of the government in turning over the records, "there would be no intrusion upon the depositors' Fourth Amendment rights." Id. at 443, 96 S.Ct. at 1624. The Court declared:
 
 
 24
 This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.
 
 
 25
 Id. That Miller's specific holding was subsequently limited by statute granting certain protections to banking records, see 12 U.S.C. §§ 3401-3422, does not affect Miller's constitutional analysis.
 
 
 26
 It is undisputed that Voss, an NCBA official, gave Adams the mailing list "with the understanding Adams would be working on it at home." Appellants' Opening Brief at 41; see also I R. tab 7 p 44; III R. 243; I Addendum ex. J-1 at 122, ex. W at 69. Applying the rule stated in Miller, we believe that a mailing list knowingly and voluntarily delivered into the custody of a third party, who turns out to be a government agent, cannot be the basis for a Fourth Amendment violation for a plaintiff who delivered the list or whose name appears on the list.
 
 
 27
 Similarly, plaintiffs did not have an expectation of privacy in their affidavits sufficient to support a Fourth Amendment violation. The plaintiffs who completed the affidavits had their affidavits notarized by a third party, and they either mailed them to Grandbouche's office,[10] see III Addendum ex. A-1 at 36, or gave them to individuals who in turn mailed the affidavits or personally delivered them to Grandbouche's office, III R. 34. The affidavits on their face do not indicate that they are to be kept confidential, and in fact Grandbouche apparently showed them to others.[11] At least when plaintiffs relinquished control over their own affidavits to Grandbouche or others, they lost their expectation of privacy in the affidavits. See Ray v. United States Dep't of Justice, 658 F.2d 608, 611 (8th Cir.1981) (no expectation of privacy in letters sent to third parties after letters delivered); United States v. Horowitz, 806 F.2d 1222, 1226 (4th Cir.1986) (defendant lacked protected expectation of privacy in information he supplied to corporation not withstanding assurances of limited use of the information); see also Miller, 425 U.S. at 443, 96 S.Ct. at 1624 (Fourth Amendment does not protect information voluntarily turned over to third party who supplies the information to the government).
 
 IV
 
 28
 Even if plaintiffs had a protected expectation of privacy in the mailing list and affidavits, plaintiffs' First and Fourth Amendment Bivens claims fail because Adams received custody of those items within the scope of her duties as Grandbouche's secretary, and therefore defendants enjoy qualified immunity. See Pleasant, 876 F.2d at 803-04. Qualified immunity protects defendants from liability for their actions that defendants reasonably believed did not violate plaintiffs' constitutional rights. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In the earlier appeal we held that defendants "are entitled to qualified immunity regarding those actions of Adams which ostensibly were within the scope of her authority at the NCBA."[12] Pleasant, 876 F.2d at 804. Thus, defendants could inspect and copy items in Adams' custody that defendants reasonably believed Adams had authority to possess; Adams could share items properly in her custody with defendants without violating plaintiffs' constitutional rights.
 
 
 29
 In the prior appeal, we specifically held that defendants enjoyed qualified immunity with regard to their actions surrounding trash removed by Adams from Grandbouche's office with his permission. Id. The purpose for the removal of the trash was to facilitate its destruction and prevent its inspection, but, we held, defendants nevertheless enjoyed qualified immunity. Likewise, the mailing list was given to Adams, and she was allowed to take it home with anticipation that it would not be copied or shared with the government.[13] We conclude that defendants also enjoy qualified immunity for their actions regarding the list.
 
 
 30
 Similarly, according to Adams, Grandbouche gave her the affidavits to take home in order to avoid their discovery by other people in the office. I Addendum ex. W at 69. The district court accepted Adams' explanation for her possession of the affidavits and found that "Mr. Grandbouche gave Ms. Adams the affidavits to keep within her custody at home. Mr. Grandbouche trusted her to exercise total control over them." Order at 17 (transcript citation omitted). Plaintiffs would have us reject this finding of fact as clearly erroneous. They argue that Adams is not a credible witness and her testimony should not be believed.
 
 
 31
 Plaintiffs also refer to a single statement in a recorded conversation when, on October 25, 1979, Grandbouche said of the affidavits, "I don't want these ever to leave this office." III Addendum ex. A-1 at 36. We agree that this statement is some evidence that Adams' account might not be correct; however, without more, we cannot find the district court's finding clearly erroneous. "The resolution of conflicting evidence and credibility determinations are for the trial judge who personally hears the evidence and observes the demeanor of the witnesses." Quezada v. County of Bernalillo, 944 F.2d 710, 721 (10th Cir.1991). The record shows that Adams, within the scope of her duties, was required to file and work with the affidavits. II id. ex. Z at 105; III id. ex. A-1 at 36, 514; see also VI R. 947-48. It is not inconceivable that Grandbouche, some weeks after his October 25th comment, might have changed his mind and allowed those affidavits to be worked on at home.[14]
 
 
 32
 Moreover, even if Adams did not properly have custody of the affidavits, the defendants are still entitled to qualified immunity if they reasonably believed her representations that she did have proper custody. See V R. 687-89, 694-96. Plaintiffs allege that Grandbouche's October 25 remark--"I don't want these ever to leave this office"--made during defendants' four day electronic monitoring put defendants on notice that Adams was exceeding her authority by producing the affidavits. However, at the time of the electronic monitoring, defendants were focused on possible imminent danger to a federal judge and would not necessarily remember the comment or construe it as connected with the affidavits produced over three weeks later. Id. at 688-89. We conclude that defendants are entitled to qualified immunity for their actions concerning the affidavits.[15] Adams' custody of the mailing list and affidavits was not "plainly beyond [Adams'] authority" as Grandbouche's secretary or office manager. See Pleasant, 876 F.2d at 804.
 
 V
 
 33
 Plaintiffs' First Amendment claims, while somewhat unclear, appear to center on the defendants' acceptance of the mailing list and the affidavits and more generally on the grand jury investigation itself. We already have held that defendants enjoy qualified immunity as to the consequences resulting from acceptance of the mailing list and the affidavits.
 
 
 34
 Plaintiffs acknowledge that defendants had a legitimate interest in conducting an investigation into Grandbouche and others regarding tax evasion and mass filings of W-4 exemption forms, but argue that the investigation should not have included investigations based upon allegations of violence and anarchy. See Appellants' Reply Brief at 18.
 
 
 35
 As important as the First and Fourth Amendment rights are, the government also may protect its important interests.
 
 
 36
 The First and Fourth Amendment rights of free speech and free association are fundamental and highly prized, and "need breathing space to survive." NAACP v. Button, 371 U.S. 415, 433 [83 S.Ct. 328, 338, 9 L.Ed.2d 405]. "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." Bates v. Little Rock, [361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960) ]....
 
 
 37
 At the same time ... there can be no question that the State has power adequately to inform itself ... in order to act and protect its legitimate and vital interests.
 
 
 38
 Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 544, 83 S.Ct. 889, 892-93, 9 L.Ed.2d 929 (1963). The government has the right to use informants and to keep abreast of possible criminal activity. Socialist Workers Party v. Attorney General of the United States, 510 F.2d 253, 256 (2d Cir.1974).
 
 
 39
 At the time of Adams' involvement and the grand jury investigation there was ample evidence to support a legitimate investigation into Grandbouche and his associates on suspicion of both tax evasion and possible advocacy of violence against the IRS and other federal officials. See Order at 26-30; I R. tab 7 pp 1, 15; IV R. 504, 507-08; Pleasant, 876 F.2d at 805 (government had compelling interest in investigating a threat against federal judge, justifying electronic surveillance); see also Alliance to End Repression v. City of Chicago, 742 F.2d 1007, 1015-16 (7th Cir.1984) (en banc) (government may investigate "a threat that was not so immediate as to permit punitive measures against the utterer"); cf. In re Grand Jury Proceeding, 842 F.2d 1229, 1236 (11th Cir.1988) (finding a grand jury investigation of NCBA justified by compelling governmental interest of investigating possible criminal violation of the tax laws). That some of the original concerns may have turned out to be unfounded is not controlling. We agree with the district court that there was a compelling governmental interest in investigating Grandbouche and his associates.
 
 
 40
 Also, the record reveals that the real targets of the grand jury investigation were Grandbouche, the Posse Comitatus and certain other individuals--not the NCBA per se. IV App.Addendum ex. 15, at 1; VI id. ex. 55, at 1; I R. tab 7 p 62; IV R. 350-51; V R. 785. Because Grandbouche and certain other individuals investigated were members or leading figures of the NCBA, the investigation quite naturally included the NCBA to some extent.[16] See IV R. 351, 357-60.
 
 
 41
 That during the initial investigation defendants may have sought from Adams the names of people associating with Grandbouche does not prove a First Amendment violation against NCBA members. The evidence does not support the notion that defendants' motive was to harass or disrupt the NCBA in any legal political pursuits. Cf. United States v. R. Enters., Inc., --- U.S. ----, ----, 111 S.Ct. 722, 727, 112 L.Ed.2d 795 (1991) ("Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass."); ACLU Found. of S. Cal. v. Barr, 952 F.2d 457, 471 (D.C.Cir.1991) (First Amendment violation possible if investigation prompted by dislike of a person's political views, or "with the intent of deterring membership in or destroying an association engaged in lawful activities"). The record supports a sincere concern by defendants for possible criminal violations and restraint on their part in respect of plaintiffs' rights. See, e.g., V R. 719; II Addendum ex. Z at 100-01; 107-09; I id. ex. W at 39, 57, 61, 70.[17]
 
 VI
 
 42
 Finally, we consider plaintiffs' allegation that the district court committed clear error in dismissing plaintiff Richard Phillips from the case. The district court found that "Richard R. Phillips is not a plaintiff of record in this case, and the court will not consider any allegations on his part." Order at 9. Plaintiffs direct our attention to the docket sheet in support of their argument. The defendants inform us that Phillips was ordered to file an affidavit as to his membership in the NCBA by a certain date prior to trial, and he failed to do so. There is nothing in the record presented to us substantiating defendants' explanation. The record does show that Phillips later filed a declaration that alleges he was an NCBA member during the relevant time period. See II R. Richard R. Phillips declaration (unnumbered); see also VI R. 1077-78. Based on the record concerning this issue, the district court's finding appears to be clearly erroneous and plaintiff Richard R. Phillips is a plaintiff of record.
 
 
 43
 We need not remand for further proceedings in the district court for this error, however. Phillips is a party to this appeal; he makes no contentions different from other plaintiffs; and the case has been resolved in favor of defendants. Accordingly, Phillips is bound by this court's rulings and is entitled to no relief.
 
 
 44
 AFFIRMED.
 
 
 
 *
 The Honorable Frederick A. Daugherty, Senior United States District Judge for the Western District of Oklahoma, sitting by designation
 
 
 [1]
 The monitoring was prompted by alleged threats against, and suspicion of a conspiracy to murder, a federal judge in Texas. In the earlier appeal this monitoring was found to be justified by a compelling governmental interest; accordingly, the monitoring was not a constitutional violation. Pleasant, 876 F.2d at 805
 
 
 [2]
 The mailing list, cassette tape, and affidavits were not used by the government except for one affidavit of a Mr. Callow who is not a plaintiff. See V R. 698-702. Callow's affidavit was used to support expansion of the 1980 grand jury investigation, see id. at 699; IV Appellants' Addendum (App.Addendum) ex. 15 at 3, because the affidavit showed Callow's connection to Grandbouche, who notarized the affidavit, and the Committee of 200,000. VI App.Addendum ex. 59 (Callow affidavit)
 
 
 [3]
 Grandbouche and others Adams associated with were convicted in separate proceedings of federal firearms violations in connection with a separate Bureau of Alcohol, Tobacco and Firearms investigation. See III R. 162, 283; V R. 622; see also IV R. 464-65
 
 
 [4]
 The district court found that Adams "was motivated to join NCBA out of her own sympathies with the movement, and a potential for financial gain." Opinion at 14. Plaintiffs argue that financial gain was clearly not Adams' motive, because she was an unpaid volunteer. In a memorandum dated October 5, 1979, defendant Lovell reported that according to Adams, she was to be paid $1500 per month for her full-time work. I Addendum ex. W at 9; see also II id. ex. Z at 64. Grandbouche indicated that Adams agreed to work as a volunteer because he told her he could not afford to pay her, I Addendum ex. J-1 at 95, and plaintiffs argue that in fact she received little compensation for her nine weeks of service, see Appellants' Opening Brief at 34-35. Indeed, Adams acknowledged that at first she would be working for little or no pay. I App.Addendum at 98. Even though Adams initially was not paid, she may have expected that she would work into a paid position eventually. In a telephone conversation Grandbouche said of Adams, in her presence, "she's very willing. She's gonna get tired of us in a hurry. We'll burn her out. Yeah. She's gotta be paid one of these days." See III Addendum ex. A-1 at 419
 
 
 [5]
 Adams did inform defendant Lovell of the possibility of employment with Grandbouche and sought his advice. Lovell told Adams that her employment with Grandbouche and the NCBA could be helpful to the IRS, but "stressed [Adams'] safety, and explained that a decision to take the position with Grandbouche should be made entirely by [her] and with [her] safety and financial situation in mind." I Addendum ex. W at 9
 
 
 [6]
 Defendants apparently conceded as much at an earlier stage of this litigation. In defendants' response to plaintiffs' cross-motion for partial summary judgment, defendants stated: "Further, defendants concede that Ms. Adams clearly intended to assist in legitimate law enforcement activities. Thus, the only true agency issue, should the Court reach the agency question, is whether any defendant instigated or encouraged Ms. Adams' alleged activities." I R. tab 4 at 10. Defendants argue that the concession was at an early stage of the litigation before the evidence of Adams' motivations were developed or at issue. Brief for the Appellees at 22 n. 11. We agree that Adams' motivations for associating with NCBA and accepting employment with Grandbouche may not have been primarily to assist law enforcement efforts, but her later conduct and assistance to defendants was primarily to assist law enforcement efforts
 
 
 [7]
 The tape was accepted by defendants after Adams made a copy of it and told defendants that it contained information about a federal judge who was a suspected target of an alleged assassination conspiracy. See IV R. 481; see also I Addendum ex. X at 4; id. ex. W at 69. Because the tape was Grandbouche's property, and Adams was directed to mail it to another nonplaintiff, plaintiffs did not have an expectation of privacy in the tape and thus no Fourth Amendment injury to plaintiffs is possible in connection with the tape
 
 
 [8]
 Plaintiffs argue that at least some of the trash removed by Adams was not bona fide trash. In the earlier appeal we recognized some evidence in support of such an inference. See Pleasant, 876 F.2d at 801 & nn. 3-5. The evidence we cited in 876 F.2d at 801 nn. 3-5 is all taken from the same debriefing session on December 19, 1979. See II Addendum ex. Z at 199, 213, 216, 230, & 241. The two specific references pointing to "created" trash are in connection with items unrelated to the NCBA and plaintiffs. Id. at 212-13, 216. Defendant Pixley testified that these comments were not made to encourage creation of trash but rather were "in keeping with the conversation, the levity, the asides." V R. 657. The district court found that "Adams did not generate trash for defendants" and found that defendants' comments were "off-the-cuff remarks" reflecting the "natural tone" of "agents conversing with an informant." Order at 16. We need not resolve this controversy because, in any event, plaintiffs do not have an expectation of privacy in either Grandbouche's trash or unidentified generated trash originating from Grandbouche's office
 
 
 [9]
 The deposition, an exhibit in the instant case, was taken in a related case in which Grandbouche was a plaintiff. The deposition testimony, with an assistant U.S. Attorney questioning and Grandbouche answering, is as follows:
 Q. And Mrs. Voss maintained the bank acount [sic] for the NCBA?
 A. She maintained all the records.
 Q. She maintained all records of NCBA. So what type record did you physically have in your possession in this office where Pauline Adams was located?
 A. All my personal correspondence, osccasionally [sic] some of the work [Voss] would send up there to have us do.
 I Addendum ex. J-1 at 133.
 Q. Okay. Now, you alleged that Pauline Adams took some of your personal correspondence and took some of your books and records. What specifically do you know that Pauline Adams took out of the offices of the NCBA and, if you will, whether it belonged to you or the NCBA?
 A. Well, it belonged to me. It was my own personal records, and there were a number of letters and, of course, the membership list.
 Q. You said the membership list belonged to you? Is that your list or Mrs. Voss'?
 A. Mrs. Voss'.
 Id. at 134.
 
 
 [10]
 On the affidavits' upper right hand corner is a line indicating whether $10 was received and a line for the signature of the individual acknowledging receipt of the money. The signatures indicate that various individuals were involved with the collection of these affidavits and viewed their contents. See VI App.Addendum ex. 59
 
 
 [11]
 One recorded conversation reveals the following:
 Grandbouche: Why, I think I'll take these affidavits with me. Show some boys what's going on.... There is nothing like seeing it.
 Adams: Seeing it for actual. How many is going to be at that meeting tonight you think?
 Grandbouche: Could be a hundred or so.
 III Addendum ex. A-1 at 26.
 
 
 [12]
 Although framed in terms of qualified immunity in our earlier appeal, this analysis also reflects on the merits of the constitutional claims. If Adams shared with defendants items properly in her custody, there would be no constitutional violation at all
 
 
 [13]
 Adams represented that the copy of the handwritten mailing list was "in essence" trash. The transcript of defendants' recorded meeting with Adams is as follows:
 Pixley This is, this is trash copies?
 [Adams] Those are trash copies in essence, uh, it'll be a trash copy. I copied those off, but there, they were trash copies after I typed them on this sheet. This is the trash copy here, and I remove it and then there's that plastic and then this becomes trash. So I'm eliminating that one part, that step there.
 Pixley This is in long hand and you've just made a typed list?
 [Adams] Yes.
 Pixley Okay.
 [Adams] Yes.
 Pixley And throwing the other away.
 II Addendum ex. Z at 21.
 It is also apparent that the list was labeled "Mailing List," see I R. tab 6 p 43; VII App.Addendum ex. 67 at 6, and was not strictly an NCBA membership list. Defendant John Pleasant stated in his "declaration" that the list included names of some of his family members and acquaintances who "were merely contributors to and/or supporters of Mr. Grandbouche during his campaign for the office of Lt. Governor in 1978." II R. Attachment to John S. Pleasant declaration (unnumbered); see also III R. 189, 198, 238. One conversation demonstrates what Adams represented concerning the mailing list:
 Lovell Tell me again what, this, these names represent?
 [Adams] These names are are [sic] people that one, belong to the National Commodity Group, two, they are Posse members, Posse Comitatus; three, they are instructors or teachers; and they're all tax strikers and to be on this list they must not have paid any income taxes. That's a requirement.
 II Addendum ex. Z at 28-29. This conversation regarding the mailing list took place on November 13, 1979. The record indicates that defendants on at least three occasions, November 1, 6, 8, specifically instructed Adams to bring only trash and not other documents. I id. ex. W at 39, 44, 45, 49; see also id. at 70; ex. X at 3. Defendants' questions indicate that they did not know what the list represented until after receiving it, and there is no indication that defendants had requested a list of NCBA members. Defendants' actions do not evince any bad faith indicating a willful violation of the First or Fourth Amendments in connection with the mailing list. See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 648 (10th Cir.1988) (to show a First Amendment Bivens claim plaintiffs must show defendants acted with bad motive).
 
 
 [14]
 Adams indicated that Grandbouche wanted the affidavits out of the office and gave them to her to keep temporarily to prevent others in the office from seeing them. I Addendum ex. W at 69
 
 
 [15]
 The district court also found that Adams produced the affidavits without the prior knowledge or consent of defendants. See Order at 17
 
 
 [16]
 At the relevant time, fall 1979, NCBA was closely identified with Grandbouche. In a deposition, an assistant U.S. Attorney questioned Grandbouche about Grandbouche's decision to hire Adams and Grandbouche answered as follows:
 Q. That was your decision to make, obviously?
 A. Yes.
 Q. Because you were the Founder of the NCBA at that time?
 A. Yes.
 Q. And for all practical purposes you were the NCBA?
 A. Yes.
 Q. Together with, if I understand it, Sharon Voss, who was a close--
 A. That was the beginning of the association concept.
 Q. Yes. Okay....
 I Addendum ex. J-1 at 102 (emphasis added).
 
 
 [17]
 Because of our disposition we do not reach the district court's findings that plaintiffs did not suffer any constitutional damages traceable to defendants' allegedly improper conduct